# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **ADIDAS AMERICA, INC.**, a Delaware corporation; **ADIDAS AG**, a foreign entity, | Case No. 3:16-cv-1400-SI |
| Plaintiffs, | **REDACTED OPINION AND ORDER DENYING PRELIMINARY INJUNCTION** |
| v. | |
| **SKECHERS USA, INC.**, a Delaware corporation, | |
| Defendant. | |

Stephen M. Feldman, PERKINS COIE LLP, 1120 NW Couch Street, Tenth Floor, Portland, OR 97209; Mitchell G. Stockwell, KILPATRICK TOWNSEND & STOCKTON LLP, 1100 Peachtree Street, Suite 2800, Atlanta, GA 30309; Matias Ferrario and Michael Morlock, KILPATRICK TOWNSEND & STOCKTON LLP, 1001 West Fourth Street, Winston-Salem, NC 27101. Of Attorneys for Plaintiffs.

Kenneth R. Davis II and Parna A. Mehrbani, LANE POWELL PC, 601 SW Second Avenue, Suite 2100, Portland, OR 97204; Mark A. Samuels, Brian M. Berliner, Andrea LaFountain, and Sina S. Aria, O'MELVENY & MYERS LLP, 400 S. Hope Street, Suite 1800, Los Angeles, CA 90071; Cameron W. Westin, O'MELVENY & MYERS LLP, 610 Newport Center Drive, 17th Floor, Newport Beach, CA 92660. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Plaintiffs adidas America, Inc. and adidas AG (collectively, "adidas") bring this lawsuit

against Defendant Skechers USA ("Skechers") for patent infringement. Plaintiffs allege that

Defendant's "Mega Blade 2.0" and "Mega Blade 2.5" shoes (collectively, the "Mega Blade shoe") infringe on Plaintiffs' United States Patent Nos. 9,339,079 (the "'079 patent") and 9,345,285 (the "'285 patent") (collectively, the "patents-in-suit"). Plaintiffs move for a preliminary injunction, seeking to enjoin Defendant from importing, manufacturing, distributing, advertising, selling, or offering for sale any footwear that infringe on either of the patents-in-suit. For the reasons that follow, the Court denies Plaintiffs' motion.

## PRELIMINARY INJUNCTION STANDARDS

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction must show: (1) that the plaintiff is likely to succeed on the merits; (2) that the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in favor of the plaintiff; and (4) that an injunction is in the public interest. *Id.* at 20 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient in some circumstances to justify a preliminary injunction). To prevail, the movant must establish both likelihood of success on the merits and likelihood of irreparable harm absent the requested relief. *Amazon.com, Inc. v. Barnesandnoble.com, Inc*., 239 F.3d 1343, 1350 (Fed. Cir. 2001). Conversely, a court may deny the requested injunction if the movant fails sufficiently to establish *either* of the elements of likelihood of success on the merits or likelihood of irreparable harm absent preliminary relief. *Murata Mach. USA v. Daifuku Co.*, 830 F.3d 1357, 1364-65 (Fed. Cir. 2016) (citing *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 973-74 (Fed. Cir. 1996)).

The Supreme Court's decision in *Winter*, however, did not entirely displace the Ninth Circuit's "sliding scale" approach to preliminary injunctions. *All. for the Wild Rockies*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this approach, "a stronger showing of one element

may offset a weaker showing of another." *Id.* Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012); *see also All. for the Wild Rockies*, 632 F.3d at 1132.

Courts previously presumed a likelihood of irreparable harm whenever a plaintiff demonstrated a likelihood of success on a patent claim. *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1148 (Fed. Cir. 2011); *see, e.g., Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 73 F. Supp. 2d 1228, 1245-46 (W.D. Wash. 1999); *Visto Corp. v. Sproqit Techs., Inc.*, 413 F. Supp. 2d 1073, 1091 (N.D. Cal. 2006). After the Supreme Court's rulings in *Winter* and *eBay Inc. v. MercExchange, L.L.C*, however, that presumption no longer applies. *Winter*, 555 U.S. at 22; *eBay*, 547 U.S. 388, 393 (2006) (disapproving use of "categorical" rules regarding irreparable harm in patent infringement cases and concluding that such a rule "cannot be squared with the principles of equity adopted by Congress").

To establish a need for a preliminary injunction, a plaintiff must show that legal remedies would be inadequate (*i.e.,* that subsequent monetary damages would not compensate the plaintiff for any harm suffered). *See Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 542 (1987). The harm alleged by the plaintiff also must be imminent and not remote or speculative. "[S]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction[;] . . . a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (emphasis in original). A threat of irreparable harm is sufficiently

immediate to warrant preliminary injunctive relief if the plaintiff "is likely to suffer irreparable harm before a decision on the merits can be rendered." *Id*. at 1023.

Further, in assessing harm, there must be sufficient evidence "that the patented features impact consumers' decisions to purchase the accused [products]." *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 809 F.3d 633, 642 (Fed. Cir. 2015) ("*Apple IV*") (holding that to show likelihood of irreparable harm the patentee must prove a "causal nexus" that relates the alleged harm to the alleged infringement). The requirement of a causal nexus applies regardless of the complexity of the products. *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1362 (Fed. Cir. 2013) ("*Apple III*"). "Put another way, the causal nexus requirement is simply a way of distinguishing between irreparable harm caused by patent infringement and irreparable harm caused by otherwise lawful competition—*e.g.*, sales [that] would be lost even if the offending feature were absent from the accused product." *Id*. at 1361 (internal citation and quotations marks omitted) (brackets in original). The former type of harm may weigh in favor of an injunction, whereas the latter does not. *Id*. "[T]he fact that the infringing features are not the only cause of the lost sales may well lessen the weight of any alleged irreparable harm, it does not eliminate it entirely. *Apple IV*, at 641-42.

Finally, the purpose of a preliminary injunction is to preserve the status quo *ante litem* pending a determination of the action on the merits. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *Boardman*, 822 F.3d at 1024. "Status quo *ante litem*" refers to "the last uncontested status which preceded the pending controversy." *Boardman*, 822 F.3d at 1024.

## FINDINGS OF FACT

The Court finds the following facts by a preponderance of the evidence:

## A. Plaintiffs

Plaintiff adidas AG, a German corporation, is the owner by assignment of the patents-in-suit, the '079 patent and the '285 patent. Both patents share common inventors, a common specification, and the same disclosure and figures. Plaintiff adidas America, Inc., a Delaware corporation, is the exclusive United States licensee of the patents-in-suit. Collectively, Plaintiffs design, develop, and market footwear, which they sell through their own website, mall stores, sporting good distributors, and on-line distributors. Defendant Skechers, a Delaware corporation, also designs, develops, and markets footwear. Skechers sells its footwear through its own website and its own retail stores, as well as to distributors and other retail entities.

The patents-in-suit, both titled "Shoe and Sole," contain the following abstract, or summary, of the patented technology:

> The present invention relates to shoe, in particular a sports shoe. The shoe includes a sole plate having in a forefoot area a plurality of leaf spring elements, wherein the sole plate and the plurality of leaf spring elements are manufactured as a single piece. Each of the plurality of leaf spring elements has one free end not connected with the sole plate.

The patents' claims describe exemplary embodiments of shoes with leaf springs. These embodiments consist of different configurations of leaf springs attached in various ways to a sole plate. When properly configured as claimed in the patents, these embodiments purportedly offer the wearer higher energy return and other performance enhancements than do other sports shoes. The patents, however, do not define the term "leaf spring" or contain the term "blade."

████████████, adidas invested substantial resources in researching, developing, and testing the patented technology. Adidas filed the application leading to the '285 patent on December 14, 2010. The application for the '285 patent was published on June 16, 2011. After

publication of a patent application, the claims made therein, as well as any further changes, are available to the public to review.

During prosecution of the '285 patent, the U.S. Patent and Trademark Office ("PTO") examiner assigned to review that patent several times rejected adidas's claims as being both indefinite and invalid in view of prior art. In response, adidas narrowed the scope of the proposed claims until the patent was allowed on April 5, 2016. The '285 patent issued on May 24, 2016.

On November 10, 2015, adidas filed a continuation application that led to the '079 patent on November 10, 2015. The application for the '079 patent was published on March 3, 2016. The PTO also initially rejected the claims of the '079 patent as anticipated or obvious in view of prior art. The '079 patent was allowed on April 4, 2016, and issued on May 17, 2016.

Adidas introduced the original Springblade shoe in June 2013. The original Springblade shoe has leaf springs across its entire bottom. The later-released Springblade Ignite only has leaf springs in the middle to rear area of the shoe. Adidas alleges that both the original Springblade shoe and the Springblade Ignite shoe practice the patents. (Unless otherwise indicated, the original Springblade shoe and the later Springblade Ignite shoe are collectively referred to simply as the "Springblade shoe.") In 2015, the academic journal *Footwear Science* published an article, based on independent testing, that concluded that the patented technology in adidas's Springblade shoe resulted in improved running performance.

Adidas markets its products, including the Springblade and other adidas sports performance shoes as a premium, high-end brand for "hardcore runners or athletes." Adidas promoted the Springblade shoe as "the first running shoe with individually tuned blades engineered to help propel runners forward with one of the most effective energy returns in the

industry." ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████

████████████████████████████████████████████████

████████████████████████████████████████████ The Springblade shoe has

received positive press and industry reviews. According to data from adidas's social media

marketing campaign, the Springblade shoe also has received a positive reaction from many

consumers.

Adidas priced the Springblade shoe as a "premium technology shoe," with prices at

launch of $180 per pair. In 2012, adidas prepared a forecast of its anticipated Springblade shoe

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██ The Springblade shoe is available in adult sizes, including women's sizes 8 through 11, and

in children's sizes down to size 4 or 3.5. The Springblade shoe is the only adult shoe on the

market with leaf springs or blades.

**B. Defendant**

Skechers manufactures the Mega Blade shoe. The Mega Blade 2.0 has leaf springs across

its entire bottom. The Mega Blade 2.5 only has leaf springs from the middle to the rear of the

shoe. Skechers began work on the design of the Mega Blade 2.0 in July 2014, and released the

shoe in May 2015. Skechers began designing the Mega Blade 2.5 in April 2015, and released

that shoe in May 2016. The Mega Blade shoe does not offer the same performance enhancement

benefits as the Springblade. Also, Skechers has never produced the Mega Blade shoe in any size

larger than children's size 5. The Mega Blade shoe is the only children's shoe on the market

other than the Springblade that has blades or leaf springs.

Skechers's Mega Blade shoe is part of its Mega Flex line of children's shoes. The Mega

Blade 2.0 was the successor to Skechers's Mega Flex Original shoe. Adidas does not accuse the

Mega Flex Original shoe of infringing either of the patents-in-suit. Skechers began developing

the Mega Flex Original in early 2013 as a "kid's shoe" with a "futuristic and robotic theme."

Skechers released the Mega Flex Original in May 2014.

The Mega Flex line is one of several lines of "fun play sneakers" that Skechers makes

and markets to pre-school and grade school children. The shoes in these lines are characterized

by design embellishments that Skechers says promote imagination and play. Skechers often

includes a robot character and related comic book with the purchase of the Mega Blade shoe.

     The Mega Blade shoe is offered for sale at generally lower prices than adidas's

Springblade shoe. The Mega Blade shoe, however, is sold at some of the same stores and on-line

sites through which adidas offers the Springblade shoe. By mid-2016, Skechers had sold

approximately 132,000 pairs of Mega Blade 2.0 shoes and 48,000 pairs of Mega Blade 2.5 shoes.

## C.    The Lawsuit and Relevant Post-Filing Events

     Adidas commenced this lawsuit on July 11, 2016, alleging that Skechers intentionally and

willfully infringed on both patents-in-suit. Adidas alleges both direct and induced infringement.

Adidas contends that the Mega Blade shoe meets every limitation of claims 12-14, 20, 23, and 24

of the '079 patent and every limitation of claims 26, 29, and 31 of the '285 patent. Plaintiffs

moved for preliminary injunction on July 29, 2016. The Court held a hearing, beginning on

October 31, 2016, and concluding on November 4, 2016, during which the Court received

documentary evidence and heard testimony and argument.

     On October 24, 2016, Skechers filed its first two petitions seeking *inter partes* review

("IPR") with the United States Patent and Trial Appeals Board ("PTAB") relating to the patents-

in-suit. Since then, Skechers has filed a total of five petitions for IPR relating to the patents-in-

suit. In each petition, Skechers raises validity challenges to all asserted claims from the patents-

in-suit. The primary differences among the several petitions relate to the prior art.

     In its first two petitions seeking IPR, filed on October 24, 2016, the "Luthi/Chan

Petitions,"[1] Skechers asks the PTAB to institute IPR on all of the claims that adidas has asserted

---

[1] The Luthi/Chan Petitions refer to the following three patents: (1) U.S. Patent No. 6,769,202 B1 issued to Luthi et al. ("Luthi '202"); (2) U.S. Patent No. 5,461,800 issued to Luthi et al. ("Luthi '800"); and (3) U.S. Patent No. 7,383,647 B2 issued to Chan et al. ("Chan").

in this lawsuit as of the date of those petitions. This consists of all thirty claims of the '079 patent and claims 20-32 of the '285 patent. In the Luthi/Chan Petitions, Skechers asserts that the challenged claims are invalid as obvious in view of certain prior art in combination with ordinary skill in the art and other references. On April 26, 2017, the PTAB instituted IPR on the two Luthi/Chan Petitions. In response to one of the Luthi/Chan Petitions, the PTAB instituted review to determine whether claims 1-30 of the '079 patent are unpatentable under 35 U.S.C. § 103 based on Luthi '202 either alone or in combination with Luthi '800 and Chan. In response to the other Luthi/Chan Petition, the PTAB instituted review to determine whether claims 20-32 of the '285 patent are unpatentable under 35 U.S.C. § 103 based on Luthi '202 either alone or in combination with Luthi '800 and Chan. In response to both Luthi/Chan Petitions, the PTAB determined that Skechers's "establishes a reasonable likelihood that [it] will prevail in showing the unpatentability of at least one of the [asserted] claims" in each of the patents-in-suit.

On November 22, 2016, Skechers filed its third and fourth IPR petitions, the "Dillon/Lyden Petitions."[2] The Dillon/Lyden Petitions challenge the same claims as the Luthi/Chan Petitions. They are based, however, on different prior art. On May 31, 2017, the PTAB declined to institute IPR in connection with the Dillon/Lyden Petitions.

On December 2, 2016, after Skechers filed its first four IPR petitions, adidas served its infringement contentions. In that document, adidas asserts several additional claims from the '285 patent that adidas had not previously raised in connection with its motion for preliminary injunction. Skechers then filed its fifth IPR petition on February 2, 2017, which addresses adidas's newly asserted claims 1, 2, 8, and 13-18 of the '285 patent. The PTAB has not

---

[2] The Dillon/Lyden Petitions refer to the following two patents: (1) U.S. Patent No. 7,549,236 B2 issued to Dillion et al. ("Dillon"); and (2) U.S. Patent No. 7,107,235 B2 issued to Lyden et al. ("Lyden").

yet ruled upon Skechers's fifth petition, but a ruling is expected by August 27, 2017. *See* 35 U.S.C. § 314(b).

## CONCLUSIONS OF LAW

### A.  Likelihood of Success on the Merits

To be entitled to preliminary injunctive relief, the patentee must make a clear showing of a likelihood of success of the merits, which includes the absence of any substantial question as to the validity of the asserted patent claims. *Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1166-67 (Fed. Cir. 2014); *see also AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1050 (holding that a "preliminary injunction should not issue if an alleged infringer raises a substantial question regarding either infringement or validity, *i.e.*, the alleged infringer asserts an infringement or invalidity defense that the patentee has not shown lacks substantial merit"). Because the alleged infringer bears the burden of persuasion regarding invalidity, that party "must show a substantial question of invalidity to avoid a showing of likelihood of success." *Erico Int'l Corp. v. Vutec Corp.*, 516 F.3d 1350, 1354 (Fed. Cir. 2008); *In re Seagate Tech., LLC*, 497 F.3d 1360, 1374 (Fed. Cir. 2007) (*abrogated on other grounds by Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1928 (2016)) ("[A]n accused infringer may avoid a preliminary injunction by showing only a substantial question as to invalidity, as opposed to the higher clear and convincing standard required to prevail on the merits") (citation omitted); *see also Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d at 1359-66 (reversing preliminary injunction because the defendant "raised substantial questions" as to the patent's validity). Adidas has not shown a likelihood of success on the merits.

In its decisions instituting IPR for both of the Luthi/Chan Petitions, the PTAB determined that Skechers "establishes a reasonable likelihood that [it] will prevail in showing the unpatentability of at least one of the [asserted] claims" in each of the patents-in-suit. The

PTAB's conclusion demonstrates that there is at least a substantial question regarding the validity of the asserted patents. As reflected in the PTAB's most recent statistics, after IPR is instituted, 81 percent of the IPRs that reach a final written decision result in invalidation of at least some of the challenged claims, and 65 percent invalidated all of the challenged claims. *See* Patent Trial and Appeal Board Statistics, Mar. 31, 2017. ECF 136-1 at 10.

In considering a patentee's motion for preliminary injunction in a lawsuit alleging patent infringement, a court may consider the PTAB's grant of IPR as a relevant factor when assessing the plaintiff's likelihood of success on the merits. *See, e.g.*, *TAS Energy, Inc. v. Stellar Energy Ams., Inc.*, 2015 WL 6156149, *7-8 (M.D. Fla. 2015) ("The PTAB's decision [granting IPR] is relevant to the Court's evaluation of [the plaintiff's] likelihood of success on the merits." (citing *Procter & Gamble Co. v. Kraft Foods Glob.*, 549 F.3d 842, 847-48 (Fed. Cir. 2008)); *see also Procter & Gamble*, 549 F.2d at 847-48 (advising the district court, pre-AIA, on remand to "consider the current posture of the *inter partes* reexamination proceedings at the PTO when evaluating [the plaintiff's] likelihood of success on the merits"); *Murata Mach. USA, Inc. v. Daifuku Co., Ltd.*, 2016 WL 4287040, *2 (D. Utah Aug. 15, 2016) (concluding that acceptance of the patents-in-suit for IPR "raises a question about the validity of the patents, which is one of the key considerations in determining whether a plaintiff is able to demonstrate a likelihood of success on the merits"); *Avery Dennison Corp. v. Alien Tech. Corp.*, 626 F. Supp. 2d 693, 702 (N.D. Ohio Mar. 18, 2009) ("Recently, several district courts have squarely addressed [the plaintiff's] argument that the PTO action is irrelevant to the district court's consideration of a preliminary injunction, and each has rejected it.") (collecting cases). Thus, based on the PTAB's instituting IPR on the pending Luthi/Chan Petitions, Adidas cannot, at this time, show a likelihood of success on the merits.

**B.  Likelihood of Irreparable Harm in the Absence of Preliminary Relief**

To be entitled to preliminary injunctive relief, the patentee also must show a likelihood of irreparable harm if a preliminary injunction is not granted. The patentee does not enjoy a presumption of irreparable injury based simply on a demonstration of a likelihood of success on the merits. *Robert Bosch LLC*, 659 F.3d at 1148. Adidas has not shown a likelihood of irreparable injury.

As previously discussed, adidas has invested substantial time and money in developing, producing, and marketing the Springblade shoe. The Springblade shoe enhances a runner's performance and enhances adidas's reputation for technological innovation and quality. The Mega Blade shoe is a substantially less expensive shoe and does not offer the same performance enhancement benefits as the Springblade shoe. Although adidas views its target consumers for its Springblade shoe as teenage or high school age males who seek superior running performance, that is not Skechers's target consumer for its Mega Blade shoe.

Adidas contends, however, that under these facts, the presence of an inferior product in the marketplace (*i.e.*, the Mega Blade shoe) will likely cause irreparable reputational harm to Springblade shoe as an innovative product and brand. Adidas also argues that this reputational harm likely will cause further irreparable harm in the form of lost sales, price erosion, and diminution in market share.

Regarding reputational harm, adidas argues that the Mega Blade's presence in the market "detracts from the coolness, cache [*sic*] and performance" that the adidas target consumer associates with Springblade. The primary support for this assertion offered by adidas is the expert testimony of its brand marketing expert, Dr. Erich Joachimsthaler. According to Dr. Joachimsthaler, empirical consumer and marketing research proves that consumers such as the target consumer here tend to avoid an "identity-signaling" product like the Springblade when

they see it associated with an "out-group," or dissociative group. In this context, young children are the "out-group," or the dissociative group, according to Dr. Joachimsthaler. When children wear the Mega Blade shoe, which have a similar "look" as the Springblade shoe, that association makes the Springblade shoe less desirable to the male teenage (or high school age) target consumer seeking athletic performance, according to adidas.

Adidas's marketing executive Chris Murphy testified that consumers view Skechers as a "lower end value brand." Adidas America's Running Category Manager, Jim Jennings, testified that Skechers's "non-premium" but "[s]imilar shoes marketed to younger kids detracts from the cache [*sic*] of Springblade shoes." Thus, according to adidas, the resulting diminution in the Springblade's distinctiveness, authenticity, and market lure will likely result in lost sales and, together with the Mega Blade's significantly lower price point, also will likely erode the price the market will bear for the higher quality Springblade shoe. Adidas also argues that the presence of Skechers's less expensive, "inferior bladed" Mega Blade shoe, marketed as a "toy" for children, impedes adidas's ability fully to develop the market share available for its premium Springblade shoe.

Skechers does not dispute that adidas has invested heavily in developing and promoting the patented technology at issue, that adidas and its Springblade shoe are perceived in the marketplace as innovative, or that the Mega Blade shoe does not offer the same technological and performance advantages as the Springblade shoe. Instead, Skechers argues that, notwithstanding those facts, adidas's claims of harm are too speculative or remote to support the required clear showing that any of the harm alleged by adidas is likely to occur absent the requested preliminary injunctive relief.

"Irreparable injury encompasses different types of losses that are often difficult to quantify, including lost sales and erosion in reputation and brand distinction." *Douglas Dynamics, LLC v. Buyers Prods. Co.,* 717 F.3d 1336, 1344 (Fed. Cir. 2013); *see also Reebok Int'l Ltd. v. J. Baker, Inc.,* 32 F.3d 1552, 1558 (Fed. Cir. 1994) ("Harm to reputation resulting from confusion between an inferior accused product and a patentee's superior product is a type of harm that is often not fully compensable by money because the damages caused are *speculative* and difficult to measure.") (emphasis added).

Adidas relies primarily on *Douglas Dynamics* to support its claim of irreparable reputational harm. In *Douglas Dynamics*, the patentee made snowplow assemblies and had earned a reputation for quality and innovation. 717 F.3d at 1339. The defendants, Buyers, entered the market with a less expensive and infringing product. The Federal Circuit reversed the district court's denial of a permanent injunction, concluding that the harm to the patentee's reputation was irreparable.

In that case, Douglas dedicated "significant amounts of time and money towards marketing and sales, engineering, and research and development" and had "earned itself a reputation in the marketplace as an innovator and trusted supplier of quality snowplows." *Id.* at 1344. Buyers, however, was regarded in the industry as producing a less expensive, poorer quality snowplow. The district court nevertheless concluded that Douglas failed to show irreparable harm to its reputation caused by Buyers's infringing product. The district court first noted that Douglas had offered no evidence that any customer ever associated Buyer's inferior product with Douglas. In light of that fact, explained the district court, and given the evidence that snowplow distributors and consumers readily differentiated between the two brands based principally on quality, the district court concluded that Douglas failed to show reputational harm.

The district court also concluded that Douglas similarly failed to show irreparable harm from lost sales or market share to Buyers. The district court based that conclusion on the fact that Douglas's market share increased slightly, even after the introduction of Buyers's product into the market, as well as the absence of any evidence of customer confusion between the two brands' products. *Id.*

The Federal Circuit reversed on both points. The Federal Circuit explained, first, that harm to a patentee's reputation can exist even absent customer confusion. Next, regarding lost sales, the court stated that "the fact that Douglas's market share increased 1% a year after Buyers introduced its infringing snowplow is, at least in this case, immaterial." *Id.* ("Simply because a patentee manages to maintain a profit in the face of infringing competition does not automatically rebut a case for irreparable injury.").

Adidas analogizes the pending lawsuit to *Douglas Dynamics* and argues that it has established irreparable harm because the evidence shows that adidas invested heavily in researching, developing, and marketing its patented product and both adidas and the Springblade shoe enjoy a reputation for innovation and quality in the eyes of the target consumer. Adidas adds that, as with the defendant's product in *Douglas Dynamics*, Skechers's Mega Blade shoe is perceived by adidas's target consumer as a cheaper and inferior product. In response to Skechers's argument that adidas has failed to provide sufficient, objective evidence to support its claim of irreparable harm, adidas states that Skechers is calling for the same kind of evidence that the Federal Circuit in *Douglas Dynamics* held was not required to support such a conclusion.

Adidas, however, both misapplies *Douglas Dynamics* and misinterprets Skechers's argument. Skechers does not argue that a patentee *must* provide objective evidence (*e.g.*, consumer surveys, marketing reports, or sales figures) to show irreparable harm. Such an

argument also might run afoul of the Supreme Court's admonition in *eBay* disapproving the use of "categorical" rules regarding irreparable harm in patent infringement cases. 547 U.S. at 393; *cf. Perfect 10, Inc. v. Google, Inc.,* 653 F.3d 976, 980-81 (9th Cir. 2011) (holding after *eBay*, "the propriety of injunctive relief in cases arising under the Copyright Act must be evaluated on a case-by-case basis in accord with traditional equitable principles and without the aid of presumptions or a 'thumb on the scale' in favor of issuing such relief").

The Federal Circuit's opinion in *Douglas Dynamics* is based on a similar prohibition against the kinds of *per se* rules and presumptions rejected in *eBay* and *Winter*. The Federal Circuit in *Douglas Dynamics* did not hold that likely irreparable harm always follows automatically whenever the record shows that the patentee invested in and earned a reputation for innovative and quality products and its competitor is viewed as an inferior imitator, as adidas appears to argue. Nor did the court in *Douglas Dynamics* hold that a patentee always must provide objective evidence of reputational, sales, or market harm in order to establish likely irreparable harm, as adidas asserts is the argument offered by Skechers. Instead, the Federal Circuit concluded that the district court had erroneously relied on the absence of certain objective evidence and that, under *eBay* and its progeny, the absence of such evidence cannot by itself rule out irreparable harm.

Applying these principles to the pending dispute, the Court begins by considering the nature of the competition between the parties. Adidas argues that the parties are direct competitors in the market for shoes, marketing to the same target customers and through the same retail channels. According to Skechers, however, the Springblade shoe and the Mega Blade shoe are not competing products because they are marketed to different target consumer groups.

Based on the evidence presented, the Court concludes that adidas and Skechers compete generally, including in the market of children's shoes. In Skechers's 2015 annual report— released more than two years after adidas introduced the Springblade shoe to the market, and seven months after Skechers introduced the Mega Blade—under the caption "COMPETITION"—Skechers identifies adidas by name as one among a number of companies whose children's footwear lines compete with Skechers's children's shoes. Skechers's report also states: "These and other competitors pose challenges to our market share in our major domestic markets." The report further notes that Skechers competes with adidas and other companies for "the limited shelf space available for displaying such products to the consumer." ECF 1-8 at 17.

Regarding the Springblade and Mega Blade shoes specifically, however, the evidence shows that, before the commencement of this litigation, adidas did not regard the Mega Blade shoe as a product that competes with the Springblade shoe. The testimony from senior adidas brand and marketing executive Chris Murphy establishes that Murphy was not even aware of the Mega Blade shoe before this litigation began. Hrg. Tr. 10/31 at 60:10-16.

Further, Adidas's internal Springblade marketing documents contain no reference to the Mega Blade shoe, although those documents do expressly refer to several other companies' performance athletic shoes as competing products with the Springblade shoe. The identified competing shoes do not have leaf springs or blades, but they do feature other kinds of purportedly performance-enhancing "visible technology," or, in footwear industry parlance, "vistech." Hrg. Tr 10/31 at 53:6-10; Hrg. Tr 10/31 at 92-93. Adidas regards those shoes, which, like the Springblade shoe, sell at a premium price point, as the Springblade shoe's "key competitors." Hrg. Tr 10/31 at 54-55; Joachimsthaler Decl. ¶ 69.

The record establishes that the Mega Blade shoe and the Springblade shoe are the only shoes on the market with blades or leafsprings and that both parties manufacture and sell those shoes in children's sizes from 3.5 to 5. Further, both brands of shoe were on the market as of May 2015. The record also establishes that the Springblade shoe and the Mega Blade shoe are sold through some of the same retail distribution channels, including such major online outlets as Amazon.com. Based on this evidence, the Court concludes that, at least beginning as of May 2015, and at least within their overlapping size ranges, the Springblade and Mega Blade shoes are competing products. The Court further concludes that the parties do not directly compete for the sale of bladed shoes other than in the narrow range of overlapping sizes.

The Court turns next to adidas's argument of reputational damage. Dr. Joachimsthaler explains that adidas's reputation is negatively affected because the Springblade shoe is similar in appearance to Skechers's Mega Blade shoe, based on both using visible technology and because the Mega Blade shoe is associated with an "out-group," or a dissociative group, *i.e.*, young children. That association, argues Dr. Joachimsthaler, makes the Springblade shoe less appealing to adidas's target customers, teenage (or high-school age) male athletes interested in running performance.

In response, Skechers argues that not only has adidas failed to present objective evidence that supports Dr. Joachimsthaler's argument, Skechers also elicited evidence from adidas's other witnesses that undermine adidas's claim of irreparable harm. Skechers also presents its own evidence to rebut adidas's assertion of irreparable harm.

First, Skechers observes that adidas itself markets and sells the Springblade shoe to children and teenage females. Second, Skechers elicited several concessions from adidas's brand and marketing experts that tend to undermine the conclusion that the presence in the market of

the Mega Blade shoe likely will cause irreparable harm to the reputation of adidas or Springblade. For example, adidas executive Murphy testified that he has seen *no* objective evidence that Mega Blade's presence in the market has undermined adidas's reputation for quality. Hrg. Tr. 10/31 at 63:9-23. Further, adidas's brand and marketing experts found no evidence of any customer confusion between the Springblade shoe and the Mega Blade shoe. Finally, and more importantly, adidas could not identify any research or evidence concerning how the target consumer for the Springblade shoe perceives the Mega Blade shoe.

In addition, adidas's Murphy found no evidence that the presence of the Mega Blade shoe in the market has in any way detracted from the "coolness" or "cachet" that male teenagers associate with adidas. Hrg. Tr. 10/31 at 64:13-65:7. Murphy is unaware of anyone outside of adidas who has ever said anything about any effect on adidas from having the Mega Blade shoe present in the market.

Further, Dr. Joachimsthaler testified that he could have measured the difference between the decrease in "utility" perceived by a male high school student when a dissociative group member wears a Springblade shoe versus a Mega Blade shoe. Indeed, according to Dr. Joachimsthaler, this type of analysis is relatively common and would require only a survey of male high school athletes. Hrg. Tr. 10/31 at 106:1-107:11; 111:3-12. Moreover, although Dr. Joachimsthaler said that such an analysis could be completed within "a few months," Hrg. Tr. 10/31 at 107:22-108:15, Skechers's expert Dr. Golder stated that he could design such a study, collect the needed data, and analyze the results in less than one month. Hrg. Tr. 11/1 at 338:20-39:4.

In either event, Dr. Joachimsthaler did not conduct such a consumer survey in this case and did not present any empirical evidence to support his conclusion, even though he

acknowledged that he could have performed such a survey. Further, Dr. Golder testified that he was unaware of any empirical evidence that showed any negative effect from the Mega Blade shoe on either adidas's or Springblade's reputation. Hrg. Tr. 11/1 at 334:2-20, 350:3-6. Based on the criticisms provided by Dr. Golder, the Court does not find persuasive the untested conclusions offered by Dr. Joachimsthaler.

The Court next addresses adidas's argument concerning lost sales, price erosion, and diminished market share. Adidas's Murphy testified that although he was not involved with shoe pricing, he would "assume" that the lower price point for Skechers's Mega Blade shoe adversely affects adidas's ability to price the Springblade shoe. Hrg. Tr. 10/31 at 54:10-15. Murphy also testified that, although he found no objective or documented evidence that there had been any particular harm to adidas from the presence in the market of the Mega Blade shoe, it is nevertheless his "expert opinion" that the Mega Blade shoe harms adidas. Hrg. Tr. 10/31 at 66:12-16. Similarly, Dr. Joachimsthaler testified that, based on his general readings and experience, adidas is likely to suffer irreparable damage to both potential sales and the willingness of consumers to pay at certain price points due to Mega Blade's presence in the market. Hrg. Tr. 10/31 at 68:15-25. Dr. Joachimsthaler concluded that it is extremely likely that Springblade will lose sales to Mega Blade. Hrg. Tr. 10/31 at 85:18-86:1.

According to data produced by adidas,  Hrg. Tr. 10/31 at 62:8-16. Hrg. Tr. 10/31 at 62:18-25. Further, Murphy also did not find

any evidence that retailers had cut back on their purchases or reduced the shelf space allocated to the Springblade shoe due to the presence in the market of the Mega Blade shoe. Hrg. Tr. 10/31 at 64:6-12. Murphy also saw no evidence of customer confusion and no evidence that Mega Blade's presence in the market has had any effect on the pricing of the Springblade shoe. Hrg. Tr. 10/31 at 65:8-23. Murphy did, however, opine that the Mega Blade shoe might affect adidas's Springblade pricing sometime in the future. Hrg. Tr. 10/31 at 65:24-66:11.

Skechers's expert witness Dr. Golder explained that, given the length of time that both the Springblade shoe and the Mega Blade shoe have been in the market, there would have been sufficient opportunity to identify evidence if there were any harm to Springblade from Mega Blade's presence. Hrg. Tr. 11/1 at 334:14-20. ███████████████████████████████ ███████████████████████████████████████████ Hrg. Tr. 11/1 at 345:24-346:1. Dr. Holder also explained that in 2012, adidas prepared a forecast of its 2015 pricing for the Springblade shoe. ██████████████████████████████████████████ ██████████████████████████████████████████ Hrg. Tr. 11/1 at 347:22-348:3. This evidence further undermines adidas's claim that its premium pricing for the Springblade shoe has been undercut by the Mega Blade shoe. Hrg. Tr. 11/1 at 348:4-9.

The evidence presented by adidas fails to make a persuasive showing that the Mega Blade shoe has had an appreciable adverse effect on the Springblade shoe. Adidas adds, however, as a further argument, that the presence of the Mega Blade shoe in the marketplace may adversely affect adidas's efforts to "reintroduce" the Springblade shoe many years in the future as an adidas "Original." Such a conclusion, however, simply is too speculative. "It is well established that as the party seeking emergency relief, [the plaintiff] 'must make a clear showing that it is at risk of irreparable harm, which entails showing a likelihood of substantial and

*immediate* irreparable injury.'" *Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012) ("*Apple II*") (emphasis added) (quoting *Apple Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012) ("*Apple I*")); *Boardman*, 822 F.3d at 1022 ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction[;] . . . a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief.") (emphasis in original). In the case now before the Court, adidas's evidence of irreparable injury is too conclusory and speculative to meet adidas's burden for a preliminary injunction.[3]

## CONCLUSION

Plaintiffs' Motion for Preliminary Injunction (ECF 27) is DENIED.

**IT IS SO ORDERED**.

DATED this 12th day of June, 2017.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge

---

[3] The Court also has concerns over whether adidas can satisfy the causal nexus requirement in this case. *See Apple III*, 735 F.3d at 1362. Because adidas has not otherwise shown that it is entitled to preliminary injunctive relief (in light of adidas's failure to establish likelihood of success on the merits and irreparable harm absent preliminary relief), the Court need not evaluate at this time the issue of causal nexus. Similarly, the Court need not determine at this time whether adidas can satisfy the additional requirements relating to a balancing of the equities and whether the public interest supports a preliminary injunction. *See Murata*, 830 F.3d at 1364-65; *Polymer*, 103 F.3d at 973-74.